1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ROBERT SIMMS,                          Case No.   2:21-cv-00035-DJC-JDP (HC)

12                      Petitioner,

13         v.                                FINDINGS AND RECOMMENDATIONS

14    JEFF LYNCH,

15                      Respondent.

16

17          Petitioner Robert Simms seeks a writ of habeas corpus under 28 U.S.C. § 2254.  ECF No.

18   1.  He was convicted of burglary and challenges a DNA analysis of his blood samples that led to

19   his conviction.  ECF No. 6 at 4.  Respondent has filed an answer, ECF No. 25, and petitioner has

20   filed a traverse, ECF No. 26.  After reviewing of the pleadings, I recommend that the petition be

21   denied.

22

23

24

25

26

27

28

                                                1

1

2                                  **Background**

3          I have reviewed the background summary drafted by the state appellate court on direct

4   appeal.  It is correct, and I reproduce it here:

5                  On December 9, 2015, G.Y. left her home in Chico in the morning,
                   locking the front door behind her; the home was in an orderly
6                  condition.  Later that day, Chico police received a report of a
                   burglary at the residence.  Chico Police Officer Cedric Schwyzer
7                  responded to the call.  He found the front door open and a window
                   broken.  The home appeared to have been ransacked and blood
8                  smears covered the light switches.  Chico Police Officer Keith
                   Parsons was the crime scene investigator.  He collected blood
9                  samples from three light switches.  For each location, he took a
                   control sample swab of distilled water, a swab of the background of
10                 the blood, and a swab of the blood itself.  He put each swab in its
                   own envelope and taped the envelope shut.  He then transported the
11                 samples back to the Chico Police Department, filled out the
                   requisite form, and booked the samples into the property system.
12
                   Officer Parsons filled out a "Physical Evidence Submission Form"
13                 (also called the BFS1 form), which is used to submit evidence to
                   the California Department of Justice (DOJ) for evaluation.  The
14                 form lists the items submitted and requests a DNA analysis for each
                   item.  At the bottom of the form is a space captioned "Chain of
15                 custody for items listed above," with a box labeled "Received
                   from" and another box labeled "Delivered to."  The first box was
16                 signed by "S. Bennett" (Sue Bennett), the Chico Police
                   Department's evidence property technician; the second box was
17                 signed by "S. Kayser" (Susan Kayser) of the Chico DOJ laboratory
                   and dated December 29, 2015.  On January 13, 2016, DOJ's
18                 Redding laboratory received a submission from the Chico
                   laboratory via Federal Express.  The submission contained the
19                 blood swabs taken from G.Y.'s home; one was tested.[1]

20                 When the Redding laboratory receives items from a laboratory, they
                   are stored in the laboratory's evidence vault until a criminalist is
21                 assigned to analyze them.  Criminalist MaryJo Olegario took the
                   swab from the evidence vault to test it for DNA.[2]
22

23   _____

24          [1] [footnote two in original text] The record is unclear as to why only one sample of blood
     from the house was tested but defendant raises no issue on appeal concerning this fact.  Nor does
25   he head [sic] and argue any challenge to the trial court's admitting various reports and testimony
     regarding the writings on the envelopes and the meaning thereof.

26          [2][footnote three in original text] Defendant asserts in his briefing that Olegario processed
     "the swabs" from the light switches.  As we explain, Olegario did process more than one swab,
27   but the others were "reference oral swabs" taken later from defendant while he was in custody.
     Her testimony makes clear that she processed only one swab (identified as KP-3) that was
28   sourced from the light switches.

                                           2

Olegario obtained a "DNA profile" on the swab by analyzing 15 locations, or "regions," using the polymerase chain reaction process, which is generally accepted by the scientific community. Once established, a DNA profile is compared to a reference sample to determine whether an individual can be included or excluded as a contributor to the sample; a mismatch at just one region will exclude a person as a contributor.

DOJ maintains a DNA database called CODIS (Combined DNA Index System), containing evidence samples or "forensic profiles," including "profiles that were submitted from other unknown sources of DNA from crime scenes" and "DNA profiles from offenders." Once a DNA profile is obtained, the laboratory uploads it, then sends it to the state database for searching at the state and national levels. Olegario furnished a report on her findings to the Chico Police Department on June 6, 2016. The report did not identify any suspect but stated that a CODIS search would follow.

On June 13, 2016, Chico Police Detective Dane Gregory was assigned to the case to "identify a subject that was identified as a suspect via a CODIS hit from a DNA sample, blood sample, obtained at [G.Y.'s residence] . . . on the day of the burglary." The laboratory report for the CODIS hit indicated that the blood sample obtained did not produce an initial match, but after it was submitted to CODIS, it was identified as likely belonging to Robert Lee Winston, identified by date of birth.

Using the "criminal index number" associated with Robert Lee Winston and checking the state database for records of prior arrests, Detective Gregory found "nine names associated with the same criminal identifying number, multiple aka's . . . for Robert Lee Winston as Mr. Robert Simms [i.e., defendant]." Five of the nine "aka's" were variations of Robert Lee Simms. By cross-referencing other numbers associated with the records of prior arrests (social security numbers, driver's license numbers, "FBI number") with DMV photographs and booking photographs from other agencies, Gregory determined that Robert Lee Winston and defendant were the same person.

Defendant was arrested on July 12, 2016 at the scene of another residential burglary.

On July 18, 2016, Gregory obtained a search warrant to take buccal swabs from defendant for comparison to the DNA identified by DOJ. Later that day, Gregory took two swabs from defendant at Butte County Jail. He booked them into Chico Police Department evidence on July 20, 2016, using a BSF1 form. Sue Bennett signed the form on behalf of the department and submitted the swabs to DOJ, and a DOJ employee at the Chico laboratory signed the form on the same date to show receipt.

Olegario received the buccal swab samples in Redding by Federal Express from the Chico laboratory on July 28, 2016, and analyzed them. In a report dated August 22, 2016, she notified the Chico Police Department that the samples provided "strong evidence" that

1

2

3

> defendant was the source of the blood from the light switch in
> G.Y.'s home. She confirmed at trial that the DNA from the two
> sets of samples, the blood and the buccal swabs, "matched."
> Gregory received the report in September 2016.

4 ECF No. 24-13 at 2-5.

5 **Discussion**

6 **I.     Legal Standards**

7    A federal court may grant habeas relief when a petitioner shows that his custody violates

8 federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

9 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

10 Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*,

11 562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the

12 last state court to have issued a reasoned opinion on petitioner's habeas claims. *See Wilson v.*

13 *Sellers*, 138 S. Ct. 1188, 1192 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003)

14 ("Because, here, neither the court of appeal nor the California Supreme Court issued a reasoned

15 opinion on the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*,

16 621 F.3d 970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was

17 last reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003)

18 ("Because the California Supreme Court denied review of Gill's habeas petition without

19 comment, we look through the unexplained California Supreme Court decision to the last

20 reasoned decision . . . as the basis for the state court's judgment.") (internal quotations omitted).

21    Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been

22 "adjudicated on the merits in state court proceedings" only if the state court's adjudication

23 resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly

24 established Federal law, as determined by the Supreme Court of the United States" or (2) "based

25 on an unreasonable determination of the facts in light of the evidence presented in the State court

26 proceeding." 28 U.S.C. § 2254(d).

27

28

4

II.   **Analysis**

Petitioner argues that his constitutional rights were violated by the admission of DNA evidence from blood and buccal swabs.  The state court of appeal rejected his claims related to the admission of this evidence:

> Defendant contends (1) the trial court abused its discretion when it admitted the DNA evidence without holding the prosecution to its burden of proof as to the chain of custody, instead shifting the burden to defendant; (2) the court applied the wrong standard in admitting the evidence; (3) the prosecution's chain of custody evidence was insufficient to meet its burden, thus the DNA evidence should have been excluded; and (4) the error requires reversal.  We are not persuaded.
>
> . . .
>
> Defendant moved orally in limine to exclude any DNA evidence gleaned from the blood samples on the basis that the People could not show an adequate chain of custody, stating correctly that the prosecution had the burden of proof. His oral motion did not mention the buccal swabs.  The prosecutor incorrectly countered that all chain of custody questions "would go to [the samples'] weight and not their admissibility."
>
> The trial court asked defendant if he had evidence to show a break in a "vital link" of the chain of custody.  Defendant said he did.
>
> The trial court stated: "[W]hat I would anticipate you would want to do is establish whatever question you would want as to the chain of custody and then argue that in closing argument that it goes to the weight." Defendant said he wanted to challenge the evidence's admissibility before it got to the jury, then added: "[T]here's 15 days unaccounted for."  The court reiterated its (incorrect) view that "blood samples are considered admissible and questions as to the chain of custody go[] to the weight of that evidence."
>
> Defendant replied: "I have the evidence now, and I would like to be heard on it."  The court said: "Go ahead."
>
> Defendant stated: "I have the original police report by Parsons who will be testifying today and the property receipt and I have [the] supplemental report.  He's the one who collected the samples. I have a receipt of those samples into [the] property room. I have his admission submission form to the DOJ.  And I have the DOJ first DNA report."
>
> The trial court asked what defendant intended to do with those documents.  Defendant replied: "My intention is to show that three days elapsed from the time they were taken off the switch until they got to evidence.  [¶] Then they went into evidence and [Schwyzer] checked them out on 12-29-2015.  And, obviously, for 15 days we have no idea where they went because the report from the DOJ lab -

5

- I believe taken out of evidence from 12-29-15 and I quote from . . . physical evidence examination of . . .[Olegario:] [¶] [‘]The following evidence was submitted to this laboratory by Susan Kaiser of the Bureau of Forensic Services Chico Laboratory and was received on January 13th. [’] That's 15 days from the time they left the evidence room and they do not go directly to the Redding lab; they go to [the] Chico laboratory on the 29th. No slips, no nothing saying who received them there or anything, and they do not resurface again until January 13th, 2016. [¶] So three days from light switch to the evidence room is unaccounted for and then 15 days from time they were taken by [Schwyzer] on 12-29. He altered his report on 12-30. So he took the DNA out on 12-29. They went to Chico laboratory. Stayed there for two weeks, 15 days[,] and then showed up at the Redding laborator[y]. So they didn't [go] directly to Redding laboratory as professed to be and then the document is altered, but it's still 15 days missing."

The prosecutor responded: "Well, the swabs were checked into the . . . Chico Police Department's evidence on 12-9, the very day they were collected, the very top of the receipt form has the date on it. [¶] This particular form wasn't printed out. It says printed on Saturday, December 12th, but they were in evidence on the 9th. On the 29th of December, the DOJ picked them up from the Chico Police Department. This is DOJ S. Kaiser, with a signature from the DOJ. And it's Evidence Technician Bennett Chico Police Department whose signatures are [on] the PES, the Physical Evidence Submission Form. [¶] They then go to the Chico laboratory, and the Chico laboratory sends them to the Redding laboratory via Federal Express and they are received in Redding on the 13th of January. [¶] *So [defendant] would have to show that they were not properly kept by those laboratories or by the Chico Police evidence section in order to show a significant break in the chain of custody. They were in the custody of the Chico Police Department or the Department of Justice the entire time.*" (Italics added in original)

Defendant asserted that the document the prosecutor was looking at was the "wrong sheet," because it concerned the buccal swab, not the blood swabs. The prosecutor countered that it was the "right sheet." Defendant said nothing else specifically about the buccal swabs. After reiterating that "the People will still need to establish chain of custody through their testimony," the trial court "at this point" denied defendant's motion to exclude the evidence. The court found that "the samples of blood from the light switches can be offered into evidence or testimony as to that in case [sic] and . . . the issue of chain of custody will go to weight of that evidence." The court did not mention the buccal swabs, and neither party raised them.

The prosecutor called Parsons, Gregory, and Olegario to establish chain of custody. They testified as indicated above.

Defendant did not raise any questions about chain of custody in cross-examining Parsons, other than to elicit that Parsons did not himself create the signatures of the Chico Police Department and

6

DOJ employees that were affixed to the BFS1 form he turned in with the blood samples. Defendant also did not raise any questions about chain of custody as to the blood samples in cross-examining Gregory, other than to establish that Gregory was not in their chain of custody.

During Olegario's testimony, defendant objected (on the purported ground "Assumes irregularity") to her statement that she "believe[d]" the Chico laboratory received the samples to test from the Chico Police Department. The trial court overruled the objection. Defendant objected again, without specifying grounds, when the prosecutor offered Exhibit 15, the BSF1 form for the blood swab including annotations. The court overruled the objection.[3]

Defendant asked if that meant there was a total of 15 days from the day the swab left the evidence room until it reached the Redding laboratory. Olegario answered: "Not necessarily. So I'm not exactly sure on the date that they sent it out. So when they received it, they probably put it into DNA evidence storage, and when they sent it out, they removed it from the evidence storage and then sent it via Federal Express." All she could be sure of is that it was sent sometime between December 29 and January 13. Olegario agreed that she did not know "how it was packaged at Chico Laboratory [or] who packaged it." When her laboratory received the swab, she followed the standard protocols for processing evidence.

After the parties rested and the trial court addressed the admissibility of the exhibits identified at trial, defendant objected to the admission of Exhibit 14, Olegario's August 22, 2016 report identifying the buccal swab as a DNA match to the blood sample. He couched his objection as "[c]hain of custody," but asserted only that it had not been shown the buccal swabs came from him ("It's not me. The buccal swabs are not me that she tested") and then added "inadequate foundation for the chain of custody for the DNA." The court overruled the objection without explanation, telling defendant that he could "argue that." Defendant also objected to the admission of Exhibit 16, the BSF1 form used to originally submit the buccal samples for comparison to the already tested blood samples, stating he had the "same objection" as to Exhibit 14, but without elaborating; the court summarily overruled that objection as well, again telling defendant he could "argue that." Defendant did not object to the admission of the exhibit (Exhibit 15) that concerned the blood samples.

In his closing argument, defendant asserted that it was unclear why the Chico laboratory did not test the blood samples instead of sending them on to the Redding laboratory.[4] He added that "there's

---

[3] [footnote four in original text] Defendant does not challenge any of these evidentiary rulings on appeal, only the general ruling finding the DNA evidence admissible.

[4] [footnote five in original text] There is no evidence in the record suggesting that the Chico laboratory has the capacity to DNA test.

no trail" to show what was done with the blood samples at the Chico laboratory before they were sent two weeks later to the Redding laboratory: "We don't know what was done at the Chico Lab, how it was stored." He did not make any chain-of-custody argument as to the buccal swabs; indeed at one point he argued that the prosecutor wanted the jury "to believe the DNA taken from the light switch, DNA taken from me, are the same. And because they are the same I committed a burglary."

. . .

"In a chain of custody claim, ' " [t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." [Citations.]' [Citations.] The trial court's exercise of discretion in admitting the evidence is reviewed on appeal for abuse of discretion." (*People v. Catlin* (2001) 26 Cal.4th 81, 134 (*Catlin*).)

"While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering." (*Méndez*, Cal. Evidence (1993) § 13.05, p. 237, quoted in *Catlin*, supra, 26 Cal.4th at p. 134.)

. . .

Defendant challenges the strength of the chain of custody evidence as to both the blood sample swab and the buccal swabs. But he did not mention the buccal swab evidence in his motion in limine to exclude DNA evidence, did not object to the admissibility of the submission form and criminalist's report on the buccal swab evidence when it was offered and discussed during trial, and did not give any specific reasons to support his very general foundational objection to that evidence during the conference on admitting exhibits. Thus his argument as to the admissibility of that evidence is forfeited. (Evid. Code, § 353 [necessity of timely and specific objection]; *People v. Partida* (2005) 37 Cal.4th 428, 435 [party cannot argue court erred in failing to conduct analysis it was not asked to conduct].) We therefore consider only his challenge to the chain of custody of the blood sample.

. . .

First, to the extent defendant contends the trial court used the wrong standard and misapplied the burden of proof in ruling on his motion in limine, the argument fails to show reversible error. While it is

true that the court (and the prosecutor) articulated that a challenge in the chain of custody went only to the weight of the evidence, which is not the law, the court then corrected its error by allowing defendant to argue to the court regarding the allegedly inadequate chain and making a preliminary determination of adequacy. (*See Catlin*, *supra*, 26 Cal.4th at p. 134.) Although the court found that defendant's showing was insufficient to exclude the blood sample evidence in limine, it noted that the People still had the burden of establishing chain of custody at trial. In other words, the court found that the prosecutor had sufficiently proffered that the People could meet their burden at trial, but its ruling was tentative ("at this time") and subject to reconsideration when the evidence was actually offered. This ruling was well within the court's discretion.

Defendant bears the burden of showing that the trial court abused its discretion by admitting the blood sample evidence after hearing the evidence presented at trial. (*Catlin*, *supra*, 26 Cal.4th at p. 134.) He argues that the People failed to document precisely where the blood sample was at every point in the timeline and to explain in minute detail the exact means by which it was processed and handled at every step. But absent evidence that the sample was not where it was represented to be at some point, or that anyone could have tampered with it at any point, such arguments at most show gaps in the chain of custody, not a missing "vital link." (*Ibid*.) Defendant does not offer evidence that tampering was reasonably likely to have occurred, but only "the barest speculation" that it could have occurred. (*Ibid*.)

*People v. Jimenez* (2008) 165 Cal.App.4th 75, the only decision cited by defendant in which the appellate court reversed because of an inadequately established chain of custody, is distinguishable. There, three witnesses testified about the chain of custody of a comparison DNA sample, but none had firsthand knowledge of their respective testimony; as a consequence, the evidence was so lacking in foundation that it could not be determined whether the sample had anything to do with the defendant. (*Id*. at pp. 79-81.) In the present case, each witness called to establish chain of custody had firsthand and personal knowledge of his or her own part in the process, and Parson's testimony established that the blood sample from which the DNA evidence was derived was left at the scene of the burglary. Defendant has not shown reversible error as to the chain of custody of the blood sample evidence.

ECF No. 24-13 at 5-12. The California Supreme Court issued a summary denial. ECF No. 24-15.

The appellate court's finding that petitioner's failure to object to the buccal swab evidence at trial forfeited the issue on appeal must be upheld. As respondent notes, the Court of Appeals has recognized the applicability of California's contemporaneous objection rule in federal habeas proceedings. *See Hines v. Enomoto*, 658 F.2d 667, 673 (9th Cir. 1981); *Vansickel v. White*, 166

9

1    F.3d 953, 957-58 (9th Cir. 1999).  I lack jurisdiction to weigh whether the state appellate court

2    correctly applied this procedural rule.  *See Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir. 1998)

3    ("Federal habeas courts lack jurisdiction, however, to review state court applications of state

4    procedural rules.").

5         Turning to the blood sample evidence, petitioner's claim that its admission violated his

6    constitutional rights is untenable.  No federal habeas relief is warranted for errors of state law,

7    including errors of state evidence law.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have

8    stated many times that federal habeas corpus relief does not lie for errors of state law.").  And,

9    with respect to clearly established federal law, "there are no controlling Supreme Court decisions

10   holding that the admission of evidence based on an inadequate chain of custody violates due

11   process."  *Luckett v. Matteson*, No. 18-cv-07670-HSG-PR, 2020 WL 6868834, 2020 U.S. Dist.

12   LEXIS 219454, at *38 (N.D. Cal. Nov. 23, 2020).  Indeed, as respondent argues, "[t]he Supreme

13   Court has made very few rulings regarding the admission of evidence as a violation of due

14   process."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

15        Accordingly, it is RECOMMENDED that the petition, ECF No. 6, be DENIED.

16        These findings and recommendations are submitted to the United States District Judge

17   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

18   after being served with these findings and recommendations, any party may file written

19   objections with the court and serve a copy on all parties.  Such a document should be captioned

20   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

21   objections shall be served and filed within fourteen days after service of the objections.  The

22   parties are advised that failure to file objections within the specified time may waive the right to

23   appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez*

24   *v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

25

26

27

28

1
2     IT IS SO ORDERED.
3
      Dated:    October 6, 2023    _____
4                                  JEREMY D. PETERSON
5                                  UNITED STATES MAGISTRATE JUDGE
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
                              11